UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

COLEEN KEANE, Personal Representative
for the Estate of Shawn L. Keane, deceased,

    Plaintiff,

v.    Case No. 1:11-CV-656

THE LINCOLN NATIONAL LIFE    HON. GORDON J. QUIST
INSURANCE COMPANY,

    Defendant.
_____/

# OPINION

    Plaintiff, Coleen Keane, as Personal Representative of the Estate of Shawn L. Keane, has sued Defendant, The Lincoln National Life Insurance Company (Lincoln National), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking to recover accidental death and dismemberment benefits under a group policy issued to Shawn L. Keane's employer.[1]  Pursuant to the Case Management Order entered on October 7, 2011, Lincoln National has filed the Administrative Record and the parties have filed cross motions for judgment based upon the Administrative Record in accordance with *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998).  For the reasons set forth below, the Court will deny Plaintiff's motion, grant Lincoln National's motion, and affirm Lincoln National's denial of benefits.

---

[1] Plaintiff alleged three claims in her Complaint: (i) a claim for benefits under ERISA (Count I); (ii) a claim for intentional infliction of emotional distress (Count II); and (iii) a claim for violation of the Michigan Consumer Protection Act, M.C.L. §§ 445.902, *et seq.* (Count III).  By Stipulation and Order entered on July 28, 2011 (dkt. # 4), the parties stipulated to dismiss the state-law claims alleged in Counts II and III, thus leaving the ERISA claim as the sole claim at issue.

## I. Background

### *The Accident*

On September 12, 2009, Shawn L. Keane (Keane) and his wife, Coleen Keane, were riding a personal watercraft in West Grand Traverse Bay, Michigan. As they rounded a buoy at slow speed, Keane, who was driving, fell into the water. Keane initially tried to climb back onto the watercraft but became fatigued and collapsed into the water. Because it was not properly fitted, Keane's life jacket fell off. Coleen jumped into the water and tried to hold Keane's head above the water while calling for help. A nearby fishing boat responded. After about twenty minutes, rescuers were able to pull Keane aboard the boat, where CPR was administered without success. Keane was taken to the marina, where medical responders attempted to resuscitate Keane. Regrettably, the medical responders' efforts failed, and Keane was pronounced dead. (Agreed Administrative R. (A.R.) at LN 127, 432.)

### *The Policy*

At the time of Keane's death, Keane's employer, Superior Inspection Services, Inc., maintained an ERISA welfare benefit plan that provided basic life insurance coverage to eligible employees. The welfare plan was insured by Lincoln National pursuant to a group life insurance policy (Policy). In addition, because Keane was a company officer, he was eligible for accidental death and dismemberment (AD&D) benefits. The Policy provides for AD&D benefits, in pertinent part, as follows:

> DEATH OR DISMEMBERMENT BENEFIT FOR AN INSURED PERSON. The Company will pay the benefit listed below, if:
> (1)   an Insured Person sustains an accidental bodily injury while insured under this provision; and
> (2)   that injury directly causes one of the following losses within 365 days after the date of the accident.
> The loss must result directly from the injury and from no other causes.
>
>    . . . .

    LIMITATIONS.  Benefits are not payable for any loss to which a contributing cause is:

    . . . .

    (2)    disease, bodily or mental infirmity, or medical or surgical treatment of these;

    . . . .

    (7)    voluntary use of drugs; except when prescribed by a Physician;

    . . . .

(*Id.* at 52.)

### *Keane's Prior Medical Conditions*

Keane's medical records disclose a number of medical conditions that had been identified and treated prior to the accident.  His medical conditions included hypertension, obesity, hyperlipidemia (fatty deposits in the blood), diabetes,[2] bilateral lower leg neuropathy, knee pain, recent tarsal tunnel surgery, post cervical discectomy with fusion, right brachial plexopathy, and situational anxiety/depression.  (*Id.* at 433.)  Keane had been prescribed, among other drugs, Methadone for treatment of lower extremity pain due to neuropathy.  (*Id.* at 402, 433.)

### *Post-Mortem Investigation*

On September 13, 2009, Dr. Matthew A. Houghton Jr., the Grand Traverse County Medical Examiner, conducted a post-mortem physical examination of Keane.  An autopsy was not performed.[3]  A post-mortem x-ray of Keane's chest showed that Keane's "lungs and pleural spaces" were clear; there was no pneumothorax (collapsed lung)[4] indicating a chest injury; and there was "no evidence of an acute cardiopulmonary process."  (*Id.* at LN 220.)  A toxicology screen found a Methadone concentration in Keane's bloodstream of 2305 ng/mL – a concentration that exceeded the lethal range.  (*Id.* at LN 141, 376.)  In addition, a toxicology report and statements in the death-

---

[2] Plaintiff correctly notes that Keane was not diabetic but rather was pre-diabetic (pre diabetes mellitus) and was taking a low dose of Metformin as a preventative measure.  (A.R. at LN 298, 323, 382-384.)

[3] In a subsequent letter to Plaintiff's counsel, Dr. Houghton explained that an autopsy was not performed because the "case did not require autopsy for Cause of Death to be determined with medical certainty."  (*Id.* at 134.)

[4] *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001151/.

3

scene investigator's reports initially indicated that Keane had a blood alcohol level of .23% or .29%. (*Id.* at LN 223, 432.) Subsequently, however, the toxicology report was corrected to show that Keane was "negative" for alcohol. (*Id.* at LN 202, 217.)

Dr. Houghton determined the immediate cause of death to be "Acute Myocardial Infarction" (heart attack) due to "Near Larygospastic [sic] Dry Drowning"[5] due to "Methadone Toxicity." Dr. Houghton listed hypertension and obesity as "Other Significant Conditions." (*Id.* at LN 433.) The Death Certificate, which Dr. Houghton signed on September 18, 2009, lists the cause of death, the conditions giving rise to the cause, and the approximate interval between onset and death for each as follows:

    a.    Acute Myocardial Infarction    4 min.

    b.    Near Laryngospastic Dry Drowning    8 min.

    c.    Methadone Toxicity    2 hrs.

(*Id.* at LN 448.) The Death Certificate also lists "Hypertension" and "Obesity" as "[o]ther significant conditions contributing to death but not resulting in the underlying cause given in Part I." (*Id.*) Dr. Houghton listed the manner of death as an "[a]ccident," as opposed to "suicide, homicide, natural, indeterminate or pending." (*Id.*)

On December 3, 2009, Dr. Richard Burke, M.D. – the physician who treated Keane for his lower extremity pain and prescribed Methadone to treat Keane's pain – wrote to Plaintiff's counsel, with a copy to Dr. Houghton, stating that Keane's death was not related to the level of Methadone in his blood. Dr. Burke explained:

> This patient has been a long term patient of the Munson Medical Center Spine and Nerve Pain Treatment Center. Patient had intractable bilateral lower extremity pain due to neuropathy. He was treated with multiple analgesic medications including methadone. He developed a tolerance to methadone over time and his dosage had

---

[5] The correct spelling, which the Court will use, is laryngospastic. *See* Dorland's Online Illustrated Medical Dictionary (31st ed. 2007), available at http://www.dorlands.com/.

4

>been gradually increased to 150 mg per day. . . . Patient's dosage was stable. The day of his death the patient was very active, as is well documented, and was not clinically toxic with methadone even though chemically postmortem blood samples demonstrated that he had toxic methadone levels. Clinically he was not altered in any way from his methadone therapy. His death was deemed to be related to cardiopulmonary cause by Dr. Matt Houghton and was not related to the methadone levels which were present in his blood, presumably at these levels for many years.

(*Id.* at LN 153.) In response to Dr. Burke's letter, Dr. Houghton amended Keane's Death Certificate on February 3, 2010, to remove "Methadone Toxicity" as an underlying cause of death. (*Id.* at LN 152.) Thus, the Amended Death Certificate identified the chain of events leading to Keane's death as "Acute Myocardial Infarction" (4 mins.) and "Near Larygospastic [sic] Dry Drowning" (8 mins.), with "Hypertension" and "Obesity" as "other significant conditions contributing to death." (*Id.*)

### *Lincoln National's Claim Denials*

Lincoln National paid Plaintiff's claim for basic life insurance benefits under the Policy in the amount of $150,000, and Plaintiff retained her present counsel to pursue her claim for AD&D benefits.

Initially, Lincoln National denied Plaintiff's claim in a decision issued on August 24, 2010, based on the exclusion for "[d]riving while intoxicated." (*Id.* at LN 229-30.) This decision was based on the incorrect toxicology report. (*Id.* at LN 229.) Lincoln National later retracted its reason for the denial based on corrected information showing that Keane's alcohol level was "negative." (*Id.* at LN 205.) Following Lincoln National's initial denial, Dr. Houghton wrote to Lincoln National explaining that "[w]ith [Keane's] history of Hypertensive Cardiovascular Disease, severe Obesity, Diabetes mellitus and Hyperlipidemia, it is within medical reason to include [sic] that he suffered a heart attack as an added result of his Near Larygospastic [sic] Dry Drowning while struggling in attempt to re-board the water-craft." (*Id.* at LN 188.) Citing Dr. Burke's prior letter, Dr. Houghton also said that the blood level of Methadone in Keane's system was "not unexpected due to his tolerance, developed-over time, to Methadone therapy." (*Id.*)

5

On October 26, 2010, Lincoln National issued a second denial, citing Keane's history of hypertensive cardiovascular disease, severe obesity, diabetes mellitus, and hyperlipidemia, and Dr. Houghton's statement that these conditions contributed to the heart attack that Keane suffered as a result of his near laryngospastic dry drowning. (*Id.* at LN 204-07.) While Lincoln National "agree[d] that Mr. Keane did experience an accident when he fell off the Jet Ski he was piloting," (*id.* at LN 205), it concluded that denial of AD&D benefits was appropriate because Keane's medical conditions contributed to his death. Thus, Lincoln National denied coverage because the accident was not the sole cause of death and the second limitation for "disease, bodily or mental infirmity, or medical or surgical treatment of these" precluded coverage. (*Id.* at LN 206.)

Plaintiff appealed the denial and, in support of her appeal, submitted sworn testimony from Dr. Houghton. As part of its review, Lincoln National retained Dr. Richard E. Sall, M.D., who is Board certified in Forensic Medicine, General Surgery, and Occupational Medicine, to review the record and prepare a report containing his forensic analysis of the cause of Keane's death. Dr. Sall concluded that the immediate cause of death was a cardiac arrhythmia, or an irregular heartbeat. (*Id.* at LN 141.) In particular, he stated that "the decedent was performing physical activity that he was unaccustomed to which combined with a dangerous level of Methadone led to the cardiac arrhythmia causing the decedent to collapse into the water and die." (*Id.* at LN 141-42.) Dr. Sall noted that Keane's medical records showed a prolonged QT interval (the measure of the time between the start of the Q wave and the end of the T wave in the heart's electrical cycle), which "is a biomarker for ventricular tachyarrhythmias . . . and a risk factor for sudden death."[6] (*Id.* at LN 145.) In other words, according to Dr. Sall, Keane was predisposed to potentially fatal arrhythmias, and the combination of increased physical exertion and a lethal level of Methadone led to a fatal

---

[6] A tachyarrhythmia occurs when the heart beats too fast. See http://www.nhlbi.nih.gov/health/health-topics/topics/arr/.

arrhythmia. Dr. Sall calculated that Keane's Methadone serum level should have been 473 ng/mL, but noted that the toxicology report disclosed a serum level of 2305 ng/mL, which provided "confirmation of the bioaccumulation of Methadone." (*Id.* at LN 146.) Dr. Sall disagreed with Dr. Houghton's conclusion of myocardial infarction due to near laryngospastic dry drowning because there was "no evidence of an acute cardiopulmonary process," there was no indication that Keane exhibited signs of chest pain, and the chest x-ray provided no evidence of drowning. (*Id.* at LN 141-42.)

Drs. Burke and Houghton reviewed and responded to Dr. Sall's report. In his March 18, 2011, letter, Dr. Burke stated that contrary to Dr. Sall's statement, "[t]he mechanism of development of methadone tolerance is due to decreased expression of the opiate receptor on the nerve cell membrane." (*Id.* at LN 132.) Thus, Dr. Burke stated, "[t]he fact that Mr. Keane has [sic] a blood level considered in the toxic range for methadone is not surprising given the fact that he was on chronic methadone maintenance and developed a tolerance to the drug based on the above mechanism." (*Id.*) Dr. Burke thus opined that "there is no evidence whatsoever indicating that Mr. Keane suffered from an increased PR interval due to excessive chronic methadone use or that he suffered cognitive or sedative side effects from his stable methadone dosage." (*Id.*) Dr. Houghton noted his disagreement with Dr. Sall's characterization and conclusions as to the cause of death:

> The interpretations of the circumstances by Dr. Sall are "spot on" to the point that Mr. Keane was ejected from his Personal Water Craft . . . . His spouse, holding on to his waist, was also ejected. This was the accident: He would not have died had he not been thrown into the water at speeds of 15 to 20 miles per hour and landed forcing water into his upper air-way.
>
> [The Keanes] were going around a buoy at [sic] speed in excess of 15 miles per hour, ejected from the craft and struck the water experiencing all three impacts with water. the initial impact of 1) striking the surface; 2) The [sic] surface tension striking back against his body and 3) piercing through the surface tension and proceeding under the water. This: 1) "shock" of the water temperature, being 15 degrees less than the air; 2) Respiratory embarrassment; 3) panic; 4) along with possibly [sic] methadone level (I defer to Dr. Richard Burke and his expertise in this matter) caused a near

7

laryngospastic near drowning experience, from which he recovered, lead to his dysrhythmia, eventually his myocardial infarction and ultimate death.

(*Id.* at LN 134.) Dr. Houghton also analogized Keane's fall from the watercraft to a powerboat "competitor['s] contact with water 'at speed.'" (*Id.* at LN 135.)

On May 4, 2011, Lincoln National issued its decision denying Plaintiff's appeal and upholding its denial of benefits. (*Id.* at LN 88-93.) In denying the appeal, Lincoln National again cited Dr. Houghton's conclusion that Keane's hypertension and obesity contributed to Keane's death. Lincoln National also cited Dr. Sall's opinion that the immediate cause of death was a cardiac arrhythmia, precipitated by strenuous physical activity to which Keane was unaccustomed and a dangerous level of Methadone. Lincoln National concluded:

> Based on review of all the information received we have decided to uphold the denial of the Accidental Death and Dismemberment portion of the life benefit based on the limitation [for disease, bodily or mental infirmity]. The policy states that the loss must result directly from the injury and from no other causes. We find that a disease or bodily infirmity was a contributing cause of the loss; therefore, we are unable to provide Accidental Death and Dismemberment benefits.

(*Id.* at LN 93.)

## II. DISCUSSION

### *Standard of Review*

Generally, in an ERISA case, a court reviews a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998). Although the Policy contains language granting Lincoln National discretionary authority to construe the Policy's terms and to determine eligibility, (A.R. at LN 82), the parties acknowledge that the proper standard of review in this case is *de novo*, in light of Michigan Administrative Code Rule 500.2202(b), which prohibits provisions granting discretionary authority to insurance companies in

group insurance policies issued after July 1, 2007. (Pl.'s Supplemental Br. To Correct Standard of Review at 2; Def.'s Mem. Supp. at 9-10.) *See Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 608-09 (6th Cir. 2009) (holding that ERISA does not preempt Michigan Administrative Rules prohibiting discretionary clauses).

In conducting a *de novo* review of a denial of benefits, a court considers only the materials contained in the administrative record in determining whether the plan administrator reached the correct decision. *See Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). "When applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision. The administrator's decision is accorded no deference or presumption of correctness." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.2d 801, 808-09 (6th Cir. 2002) (internal quotations and citation omitted). The Court's application of the *de novo* standard of review essentially renders Plaintiff's arguments in her opening brief pertaining to deferential review – such as Lincoln National's conflict of interest as both reviewer of claims and payer of benefits – irrelevant. *See McCollum v. Life Ins. Co. of N. Am.*, No. 10-11471 , 2010 WL 5015394, at *2 (E.D. Mich. Dec. 3, 2010) ("Where the court will review the record *de novo*–rather than for abuse of discretion–the relevance of discovery regarding conflicts of interest is vanishingly minute."); *Daul v. PPM Energy, Inc.*, No. 08-CV-524-AC, 2010 WL 3945001, at *10 (D. Or. Oct. 6, 2010) ("If, as plaintiffs claim, the standard of review is *de novo*, then conflict of interest discovery is irrelevant.").

### *Claim for Benefits*

Because the Policy is an ERISA plan, the Court must apply federal common law. *Univ. Hosps. of Cleveland v. S. Lorain Merchs. Ass'n Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 437 (6th Cir. 2006). Courts must interpret ERISA plan provisions "according to their plain meaning, in an ordinary and popular sense." *Perez*, 150 F.3d at 556. In applying this plain meaning

9

analysis, the Court must give effect to the plan's unambiguous terms. *Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir.1996). In the absence of established federal common law, courts may look to state-law principles for guidance. *Tinsley v. Gen. Motors Corp.*, 227 F.3d 700, 704 (6th Cir. 2000). Because the Policy requires a claimant to submit a proof of claim as to the cause of death, Plaintiff bears the burden of demonstrating that Keane's death was accidental. *See Rose v. Hartford Fin. Servs. Grp., Inc.*, 268 F. App'x 444, 452 (6th Cir. 2008). In contrast, an insurer, such as Lincoln National, has the burden of proving exclusions from coverage. *Caffey v. Unum Life Ins. Co. of Am.*, No. 95-6373, 1997 WL 49128, at *3 (6th Cir. Feb. 3, 1997).

Plaintiff argues that Lincoln National improperly denied benefits because the substantial evidence in the record shows that Keane died as a result of a boating accident. Plaintiff points to the Amended Death Certificate, as well as to Dr. Houghton's sworn testimony and his March 20, 2011, letter to Plaintiff's counsel as proof that Keane died as a result of an accident. Although Plaintiff is correct that Keane's death resulted from an accident, her argument misses the point. The evidence is undisputed, and Lincoln National concedes, that Keane's fall from the watercraft was accidental and that Keane died because of this accident. The issue in contention, however, is whether the limitation or exclusion for "disease, bodily or mental infirmity, or medical or surgical treatment of these" as a "contributory cause" applies to preclude coverage. For this reason, Plaintiff's reliance on *Thies v. Life Insurance Co. of North America*, 804 F. Supp. 2d 560 (W.D. Ky. 2011), and *Kovach v. Zurich American Insurance Co.*, 587 F.3d 323 (6th Cir. 2009), is misplaced. The decedents in both *Thies* and *Kovach* were intoxicated and the central issue in both cases was whether the injury or death was due to an accident. *See Thies*, 804 F. Supp. 2d at 568-572; *Kovach*, 587 F.3d at 329-30. In addition, both cases involved intentionally self-inflicted injury exclusions. *See Thies*, 804 F. Supp. 2d at 572; *Kovach*, 587 F.3d at 338-39. Neither *Thies* nor *Kovach* involved an exclusion for "disease, bodily or mental infirmity, or medical or surgical treatment of these," and,

as noted, unlike those cases, there is no question here that Keane's fall from the personal watercraft was an accident.

As support for its denial of coverage, Lincoln National cites two unreported Sixth Circuit cases, *McGuire v. Reliance Standard Life Insurance Co.*, No. 98-2231, 2000 WL 92264 (6th Cir. Jan. 18, 2000) (per curiam), and *Criss v. Hartford Accident & Indemnity Co.*, No. 91-2092, 1992 WL 113379 (6th Cir. May 28, 1992) (per curiam), both of which involved sickness or disease exclusions similar to the exclusion at issue in this case.[7] In *McGuire*, the decedent was covered under an AD&D policy which provided coverage for losses resulting "'directly and independently of all other causes from bodily injury caused by accident which occurs while this Policy is in force.'" *Id.* at *4. The policy also excluded coverage for "'any loss . . . to which sickness or disease is a contributing factor.'" *Id.* at *1. The decedent, who had a history of severe arteriosclerotic cardiovascular disease, was found face-down in the water in a hot tub shortly after he was seen swimming in a pool. The death certificate listed the immediate cause of death as asphyxia due to drowning and listed arteriosclerotic cardiovascular disease under "'other significant conditions contributing to death but not resulting in the underlying cause [of death].'" *Id.* Based on information indicating that the decedent's arteriosclerotic cardiovascular disease contributed to his death, the insurer denied coverage. The district court granted summary judgment to the insurer, concluding that there was no issue of fact that the decedent's heart disease contributed to his death. On appeal, the plaintiff argued that the insurer failed to meet its burden of showing that the exclusion applied because the evidence was uncertain as to whether the heart disease caused the death or merely caused the accident.[8] The Sixth Circuit disagreed, noting that "[t]he uncertainty about the extent to

---

[7] The Sixth Circuit applied a *de novo* standard of review in both *McGuire* and *Criss*.

[8] *McGuire* was a pre-*Wilkins* case and, thus, the district court employed the summary judgment standard to resolve the dispute. Moreover, although the insurer argued that the policy was governed by ERISA, the district court declined to resolve the issue. *McGuire*, 200 WL 92264, at *3. The Sixth Circuit also found it unnecessary to reach the

11

which heart disease contributed to Wallace's death would be material only if the exclusionary language precluded coverage when the disease was a direct proximate cause of the loss, but not when the disease was a 'but for' or 'remote' cause." *Id.* at *4. As support for its conclusion, the Sixth Circuit cited *Berger v. Travelers Insurance Co.*, 379 Mich. 51, 149 N.W.2d 441 (1967), in which the Michigan Supreme Court stated that "sole cause" coverage provisions

> do not necessarily preclude recovery when death results from a combination of accidental injury and pre-existing disease but, rather, that recovery may be had when it is proved as a matter of fact that "an accidental external injury was the efficient, dominant, proximate cause of the death of the insured."

*Id.* (quoting *Berger*, 379 Mich. at 53, 149 N.W.2d at 442 (quoting *Kangas v. N.Y. Life Ins. Co.*, 223 Mich. 238, 244, 193 N.W. 867, 869 (1923))). The Sixth Circuit noted, however, that the *Berger* court clarified that the *Kangas* rule does not apply when the policy contains an exclusion that negates liability if disease directly or indirectly causes death. "Such exclusionary clauses," the Sixth Circuit explained, "whether used alone or in conjunction with a sole cause clause, 'necessarily *do preclude* recovery when death results from a preexisting disease or from a combination of accident and preexisting disease." *Id.* (quoting *Berger*, 379 Mich. at 54, 149 N.W.2d at 442). Thus, "[i]f the policy excludes loss resulting directly or indirectly from disease, the accident itself must have been sufficient to cause death." *Id.* The court concluded that summary judgment in favor of the insurer was proper because there was no dispute that the decedent's arteriosclerotic cardiovascular disease was a contributing factor in the death. *See id.* at *5.

In *Criss*, the decedent was seriously injured in an automobile accident. While being treated for his injuries in the hospital, medical providers determined that the decedent was suffering from severe heart disease and had suffered a heart attack at some unknown time in the past. On the third day of his hospitalization, the decedent went into cardiac arrest and died. The death certificate listed

---

issue because it would not have altered the outcome. *See id.*

the immediate cause of death as severe coronary artery disease due to, or as a consequence of, arteriosclerotic cardiovascular disease. *Criss*, 1992 WL 113370, at *1. The AD&D policies at issue defined "injury" as "bodily injury resulting directly and independently of all other causes from accident which occurs while you are covered under this policy." *Id.* at *2. The policies further provided that "[l]oss resulting from . . . sickness or disease . . . or . . . medical or surgical treatment of a sickness or disease . . . is not considered as resulting from injury." *Id.* The insurer denied the claim for benefits on the basis that the evidence showed that the decedent died from coronary heart disease rather than from the injuries from the automobile accident. The Sixth Circuit affirmed the district court's grant of summary judgment. Although five physician-witnesses disagreed on the extent to which the decedent's heart disease contributed to his death, all agreed that his heart disease contributed to his death. The court concluded that

> the dispute over whether [the decedent's] fatal heart attack was triggered by the underlying heart disease or by the trauma from injuries sustained in the car accident and the subsequent surgery becomes irrelevant in view of the exclusionary language of the insurance policies in question. These policies specifically exclude from coverage any loss resulting from sickness or disease. There being no doubt that Mr. Criss's death occurred from a combination of the underlying heart disease and injuries sustained in the collision, the question of which one of these two factors triggered the fatal heart attack is immaterial.

*Id.* at *6.

Citing *Berger*, *supra*, and *Harrison v. Monumental Life Insurance Co.*, 333 F.3d 717 (6th Cir. 2003), Plaintiff contends that Michigan law holds that a pre-existing medical condition that contributes to death does not preclude a claim for benefits under an AD&D policy containing a "sole cause" policy if the claimant can show that accidental injury is the proximate cause of the death. While Plaintiff's argument is correct as far as it goes, Plaintiff fails to acknowledge – as the Sixth Circuit acknowledged in *McGuire* – that *Berger* also holds that coverage is precluded if the policy contains an exclusion for sickness or disease and "death results from a preexisting disease or from

13

a combination of accident and preexisting disease." *Berger*, 379 Mich. at 54, 149 N.W.2d at 442. Similarly, in quoting footnote 4 of the *Harrison* decision at page 12 of her moving brief, Plaintiff omits a critical point by the court, shown below in italics:

> A few examples may suffice to show how we understand these two different clauses are correctly applied. A person with hemophilia is involved in a car accident and sustains a small cut which would not be fatal to another, but which caused this person to bleed to death because his blood would not clot. If this person was insured under an accidental death policy containing only a "sole clause," [sic] the claimant would prevail because the car accident was the proximate cause of the insured's death because it caused the cut which caused the insured to bleed to death. *If, however, this same person was covered under an accidental death policy containing an "exclusionary clause," then the claimant would not prevail because, absent the hemophilia, the cut caused by the accident otherwise would not have been fatal. . . .*

*Harrison*, 333 F.3d at 722 n.4. The Lincoln National Policy at issue here contains such an exclusion.

As shown above, the physicians who opined on the issue expressed different views about the cause of Keane's death. Dr. Houghton concluded that Keane died of a heart attack due to near laryngospastic dry drowning. Dr. Sall concluded that Keane died as a result of a cardiac arrhythmia caused by Keane engaging in physical activity that he was not accustomed to performing, combined with a dangerous level of Methadone. Disagreeing with Dr. Sall, Dr. Burke opined that the level of Methadone was not a cause of Keane's death, although Dr. Burke did not opine on the cause of death and simply deferred to Dr. Houghton's conclusions. In any event, however, both Dr. Houghton and Dr. Sall concluded that Keane's preexisting disease or bodily infirmity contributed to his death. In his Death Scene Investigation Report, Dr. Houghton listed "hypertension" and "obesity" as "other significant conditions, (A.R. at LN 433), and on the Amended Death Certificate Dr. Houghton listed "hypertension" and "obesity" as "other significant conditions contributing to death." (*Id.* at LN 152.) In his October 11, 2010, letter to Lincoln National, Dr. Houghton further opined that "[w]ith [Keane's] history of Hypertensive Cardiovascular Disease, severe Obesity,

14

Diabetes mellitus and Hyperlipidemia, it is within medical reason to include [sic] that he suffered a heart attack as an added result of his Near Larygospastic [sic] Dry Drowning while struggling in attempt to re-board the water-craft."[9] (*Id.* at LN 188.) In contrast, Dr. Sall noted that Keane's medical history showed a prolonged QT interval – a condition "plac[ing] [Keane] in danger of sudden cardiac death," (A.R. at LN 146), which, combined with unusual physical exertion and a dangerous Methadone level, resulted in Keane's death.

In spite of the physicians' disagreement, the Court need not resolve the precise cause because under either physician's analysis Keane's disease or bodily infirmity contributed to his death. As *McGuire* holds, because the Policy contains an exclusion for disease or bodily infirmity, the Court need not determine which of the two physicians' opinions is correct, as disease or bodily infirmity contributed to Keane's death in both scenarios. Moreover, the Court need not determine the extent to which disease or bodily infirmity contributed to Keane's death. *See McGuire*, 2000 WL 92264, at *5.

Citing Keane's medical records, Plaintiff argues that there is no evidence that a preexisting disease or infirmity contributed to Keane's death. First, Plaintiff argues that Keane had no preexisting heart condition because his cardiologist, Dr. Roberto Corpus, noted in an April 18, 2007, check-up that Keane "is doing quite well from a cardiovascular standpoint," (A.R. at LN 283), and other medical records fail to mention any heart condition. Second, Plaintiff argues that the level of Methadone was not fatal to Keane because Dr. Burke confirmed that Keane had developed a tolerance to the drug over time and given his history of usage it could be presumed that Methadone had been in Keane's blood at elevated levels for many years. Plaintiff further notes that even if Keane had a dangerous level of Methadone in his blood, coverage would not be excluded because

---

[9] Dr. Houghton also confirmed in his sworn testimony the role Keane's heart disease played in the death, when he confirmed that the dry drowning "compromised [Keane's] already existing cardiac condition which then caused him to expire." (A.R. at LN 192.)

15

limitation (7) excepts from exclusion drugs "prescribed by a Physician."  Third, regarding Keane's hypertension, Plaintiff notes that Keane's primary care physician stated in a February 19, 2009, office note that Keane's hypertension was "well controlled with Zestril." (*Id.* at LN 345.)  Finally, regarding Keane's obesity, Plaintiff notes that Keane did not weigh 350 pounds, as set forth in the Death Scene Investigation Report, but instead had made substantial progress in losing weight over time, with a recorded weight of 284 pounds only four days before his death.  (*Id.* at LN 382.)

Although Plaintiff paints Keane in a more healthy light, her arguments fail for several reasons.

First, it is undisputed that Keane suffered from hypertension – a disease closely connected to heart disease.[10]  While it is true that Keane's physician noted that Keane's hypertension was "well controlled with Zestril," the fact remains that Keane still suffered from hypertension, was at an increased risk for cardiac arrhythmia, and was engaging in strenuous physical activity at the time of his death that he was not accustomed to performing.  Moreover, both Dr. Houghton and Dr. Sall noted that Keane suffered from various ailments that rendered him vulnerable to dangerous cardiac events.  Second, as Plaintiff concedes, although Keane did not weigh 350 pounds at his death, at 284 pounds, he was still obese.[11]  (Pl.'s Reply at 7.)  Third, regarding Keane's Methadone level, Keane's medical records tend to undermine Dr. Burke's statement that Keane likely had the same blood Methadone level for many years.  The post-mortem toxicology report indicated a Methadone concentration of 2305 ng/mL, but less than four months earlier, Keane's Methadone level was measured at 1636 ng/ML – substantially below the level at the time of his death.  (*Id.* at LN 248.)  Nonetheless, Plaintiff makes a persuasive argument that Methadone toxicity cannot preclude

---

[10] *See* http://www.nlm.nih.gov/medlineplus/ency/article/000163.htm.

[11] Keane does not argue that obesity is not a disease, although it appears that the issue is still open to debate in the medical community.  *See* Rachael Rettner, *Is Obesity a Disease? Doctors Disagree*, MyHealthNewsDaily (June 28, 2012, 11:48 AM), http://todayhealth.today.msnbc.msn.com/_news/2012/06/28/12460026.

16

coverage under limitation (2) for "medial or surgical treatment" of disease or infirmity because Keane was taking Methadone as prescribed by a physician, and limitation (7) excepts from exclusion any voluntary use of drugs "when prescribed by a Physician." In *Smith v. Stonebridge Life Insurance Co.*, 582 F. Supp. 2d 1209 (N.D. Cal. 2008), the decedent was found dead on her bed with a near-empty bottle of OxyContin. The coroner determined that the death was an accident and that the cause of death was oxycodone intoxication. *Id.* at 1213-14. The AD&D policy at issue contained an exclusion identical to limitation (2) in the Policy in this case for "disease, bodily or mental infirmity, or medical treatment of these." The insurer argued that this exclusion applied because the OxyContin was prescribed to treat the decedent's pain. Although the court noted that "the medical exclusion could possibly be read to apply to deaths caused by taking prescription drugs," it rejected the insurer's argument because it would render the policy's exception to the drug exclusion for drugs "prescribed by a Physician" meaningless. *Id.* at 1224. As set forth above, however, in the instant case there is a disagreement as to whether Methadone toxicity played any part in Keane's death, with Dr. Houghton – who appears to have sided with Plaintiff – concluding that it played no part at all. Regardless, even if Dr. Sall's conclusion is accepted that dangerous levels of Methadone contributed to Keane's death, coverage would still be excluded because Dr. Sall opined that the Methadone toxicity combined with Keane's predisposition for fatal cardiac arrhythmias to cause his death. Thus, limitation (2) would still apply even if Methadone toxicity would not exclude coverage.

Moreover, as noted above, Dr. Houghton said that Keane's hypertensive cardiovascular disease and obesity contributed to Keane's death, and Dr. Sall opined that Keane was at risk for sudden cardiac death. No physician has said that Keane's preexisting diseases were not a factor in his death.

17

Finally, Plaintiff cites the treating physician rule, apparently as a basis for the Court to accept Dr. Houghton's explanation of death in his March 20, 2011, letter to Plaintiff's counsel. This argument also fails for several reasons. First, the Supreme Court has held that the "treating physician rule" does not apply in the ERISA context. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 123 S. Ct. 1965, 1970 (2003) ("Nothing in the Act itself . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."). Second, even if such rule applied, it would serve no purpose in the context of *de novo* review. *See Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 n.4 (2d Cir. 2001). Third, Plaintiff cites no authority for the proposition that a medical examiner conducting a death investigation can be considered the deceased's "treating physician." Finally, the Court rejects Dr. Houghton's opinions in his March 20, 2011, letter because they are unsupported by fact and appear, at least in this Court's judgment, to be biased in favor of Plaintiff. For example, Dr. Houghton states that Keane and his wife rounded the buoy at a speed in excess of 15 miles per hour, but reports of the incident described the watercraft as "slow moving," (A.R. at LN 127), and Dr. Houghton's statement that Keane and his wife were both ejected from the watercraft is incorrect, as Coleen did not fall into the water but instead jumped in to hold Keene's head above the water after he collapsed. Moreover, there was no evidence that Keane struck the water when he fell off the watercraft or that he suffered any injury from striking the water. By all accounts, Keane recovered from the fall and attempted to re-board the watercraft but became fatigued and fell back into the water. In short, Keane's fall from the watercraft was not comparable to a "powerboat . . . competitor['s] contact with water 'at speed.'" (*Id.* at LN 135.)

In sum, after conducting a *de novo* review of the record, the Court concludes that Lincoln National reached the correct result.

18

*Attorney Fees*

In light of the Court's decision to affirm Lincoln National's decision denying Plaintiff benefits, Plaintiff's request for attorney fees will be denied.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Lincoln National's motion for entry of judgment and deny Plaintiff's motion for judgment on the administrative record.

An Order consistent with this Opinion will be entered.


Dated: September 18, 2012  /s/ Gordon J. Quist
GORDON J. QUIST
UNITED STATES DISTRICT JUDGE